# 25-1505-cr

# United States Court of Appeals

*for the*

# Second Circuit

UNITED STATES OF AMERICA,

*Appellee,*

– v. –

JOHN GALANIS, JARED GALANIS, GARY HIRST,
DEREK GALANIS, YMER SHAHINI, GAVIN HAMELS,

*Defendants,*

JASON GALANIS,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## REPLY BRIEF FOR DEFENDANT-APPELLANT

DAVID TOUGER
PELUSO & TOUGER, LLP
*Attorneys for Defendant-Appellant*
408 Broadway, 2nd Floor
New York, New York 10013
(212) 608-1234

COUNSEL PRESS    (800) 4-APPEAL • (391917)

# TABLE OF CONTENTS

Argument

I.   The Government's New Reliance on *United States v. Romeo* Supports Galanis, Not the Government ................................................................................. 1

II.  The Government's Statutory Chain-of-Custody Argument Under 28 U.S.C. § 524(c)(1) Fails Because the Assets Forfeiture Fund Is Not the General Treasury Contemplated by *Knote* .................................................................. 3

III. The Attorney General Cannot Exercise Discretion to Defeat the Presidential Directive She Was Commanded to Carry Out—and The MLARS Two-Step Approval Requirement Makes This Concrete ....................................................... 5

    A. The Government's *Romeo* Defense Cannot Overcome the Commutation Order's Designation of the AG as the President's Personal Agent ............ 5

    B. The Government's Reliance on the Prior-Administration MLARS Approval Cannot Survive the Commutation Order or the Change in Administration…………………………………………….................... 7

    C. The Resulting Constitutional Disability Is Permanent and Precludes Completion at Every Level of the Chain of Command............................. 9

IV.  The Government's Internal Contradiction on Forfeiture and Restitution Independently Defeats Its Position ...................................................... 12

V.   The Government's Fallback in Footnote 5 Confirms That Equitable Relief Is

Required ........................................................................................  17

VI.  The Devon Archer Comparison Confirms Rather Than Defeats Galanis's

Position ........................................................................................  19

VII. The Government's Vesting Theory Fails Under Its Own Authority and

*Boultbee* Is Distinguishable and Does Not Control ........................................  23

Conclusion ........................................................................................  26

# TABLE OF AUTHORITIES

**Cases:**

United States v. Zaleski, *686 F.3d 90 (2d Cir. 2012)* .......................................... 1

United States v. Romeo, *136 F.4th 372 (2d Cir. 2025)* ........... 1, 2, 5, 6, 7, 9 & 13

Knote v. United States, *95 U.S. 149 (1877)* ........................ 2 ,3 ,4, 5, 23, 24 & 25

Myers v. United States, *272 U.S. 52 (1926)* ........................................................8

Seila Law LLC v. CFPB, *140 S. Ct. 2183 (2020)* .................................................. 8

Trump v. United States, *602 U.S. ___ (2024)* ......................................................8

Off. of Pers. Mgmt. v. Richmond, *496 U.S. 414 (1990)* .......................................9

United States v. Torres, *703 F.3d 194 (2d Cir. 2012)* .............................13 & 17

Bates v. Long Island R.R. Co., *997 F.2d 1028 (2d Cir. 1993)* ......................... 14

New Hampshire v. Maine, *532 U.S. 742 (2001)* ............................................... 14

*United States v. Sharma*, 18 Cr. 340 (LGS), 2022 WL 1910026 (S.D.N.Y. June 3, 2022) ................................................................................................. 15

Dennis v. Terris, *927 F.3d 955 (6th Cir. 2019)* .................................................20

Andrews v. Warden, *958 F.3d 1072 (11th Cir. 2020)* .......................................22

*Boultbee v. United States,No. 23-1884, 2024 WL 3220261 (Fed. Cl. June 27, 2024), aff'd, No. 2024-2260, 2025 WL 1077679 (Fed. Cir. Apr. 10, 2025)* ..24 & 25

**Constitutional Provisions:**

U.S. Const. Art. I, § 9, cl. 7 (Appropriations Clause) ............................... passim

U.S. Const. Art. II, § 1, cl. 1 (Vesting Clause) .........................................3, 15, & 23

U.S. Const. Art. II, § 2, cl. 1 (Pardon Power) ........................................... passim

**Statutes and Regulations:**

18 U.S.C. § 981(e)(6) ........................................................................5, 6

28 C.F.R. § 9.8 ...................................................................................8

28 U.S.C. § 524(c)(1) .......................................................................3 & 4

**Other Authorities:**

DOJ Asset Forfeiture Policy Manual (2016 ed.), Ch. 14 ........................................7

# ARGUMENT

## I. THE GOVERNMENT'S NEW RELIANCE ON UNITED STATES V. ROMEO SUPPORTS GALANIS, NOT THE GOVERNMENT.

The Government's brief, filed March 19, 2026, introduces *United States v. Romeo*, 136 F.4th 372 (2d Cir. 2025), as its primary authority for the proposition that the Attorney General acted within congressional authorization in directing the Forfeiture Proceeds toward victim restoration. (Br. for United States 20.) This Court reviews legal conclusions de novo. *United States v. Zaleski*, 686 F.3d 90, 92 (2d Cir. 2012). *Romeo*, decided after Galanis filed his opening brief, could not have been addressed there. It is addressed now.

*Romeo* held that the Government is not *obligated* to apply forfeited property to restitution and that the Attorney General has discretion in that decision. *Id*. at 381. The Government reads this as insulating the restoration process from scrutiny. That reading does not withstand scrutiny. *Romeo* resolved a challenge by a defendant who argued the Government *must* apply forfeiture to restitution. The court rejected that mandatory theory. It said nothing about whether a discretionary restoration decision survives a Presidential commutation expressly eliminating the restitution obligation that the restoration process is designed to fulfill.

1

The Government's reliance on *Romeo* fortifies Galanis's central argument. If the restoration decision is purely discretionary—as *Romeo* confirms—then it is not compelled by any act of Congress. It is an executive choice. That characterization matters enormously for the *Knote*/Appropriations Clause analysis. The Appropriations Clause prohibits the Executive from directing expenditures from the Treasury absent congressional authorization. *Knote* applies that principle to prevent a pardon from compelling the Treasury to repay a convicted defendant. Neither case, however, addresses the reverse question: whether a *discretionary executive decision* to distribute funds to third parties—a decision not yet consummated—can be immunized from a subsequent Presidential directive that eliminates the legal predicate for the distribution.

The Appropriations Clause concern is about Presidential overreach into congressional prerogatives. Where the executive action at issue is discretionary— not congressionally mandated—the clause's protective rationale does not apply with the same force. The Government cannot simultaneously wield *Romeo* as a sword— restoration is discretionary; therefore the AG may proceed free of judicial compulsion—and *Knote*'s Appropriations Clause holding as a shield—the funds are in the Treasury, therefore no competing Presidential directive can reach them. These doctrines address opposite threats: one limits mandatory compulsion of executive discretion, the other limits Presidential interference with congressional

2

appropriations. They do not operate in the same direction, they cannot both apply to the same set of facts, and the Government's attempt to merge them into a single impenetrable defense is the classic use of a legal doctrine as both sword and shield that this Court has consistently declined to permit.

## II. THE GOVERNMENT'S NEW STATUTORY CHAIN-OF-CUSTODY ARGUMENT UNDER 28 U.S.C. § 524(c)(1) FAILS BECAUSE THE ASSETS FORFEITURE FUND IS NOT IN THE GENERAL TREASURY CONTEMPLATED BY KNOTE.

The Government constructs a new argument: that upon entry of the Final Forfeiture Order in November 2020, the Forfeiture Proceeds were immediately transferred to the Assets Forfeiture Fund ("AFF"), which the Government characterizes as "part of the United States Treasury" under 28 U.S.C. § 524(c)(1), and that the *Knote* vesting trigger therefore occurred five years before the Commutation Order, rendering all subsequent transfers legally irrelevant. (Br. for United States 19.) This argument is unavailing.

*Knote* addressed proceeds from the sale of Confederate property "paid into the treasury of the United States" and absorbed into general revenues. *Id*. at 149. The Court's concern was that money once commingled with general government funds could not be extracted without a congressional appropriation because the Appropriations Clause prohibits drawing on the Treasury without legislative authority. *Id.* at 154. That structural concern presupposes fungibility: money

3

deposited into the general Treasury loses its identity, becomes indistinguishable from other government funds, and can only be returned through the appropriations process because there is no other mechanism to identify and segregate it.

The funds in question herein are not in the same position, they have not been commingled into the general treasury. The AFF is specifically a designated as a "special fund"—not the general Treasury—for restricted purposes under 28 U.S.C. § 524(c)(1). Money in the AFF retains its identity as forfeiture proceeds. It is subject to specific congressional disposition rules governing permissible uses. The Government's own brief demonstrates this by tracing the Forfeiture Proceeds through a specific, documented pipeline: Final Forfeiture Order (November 2020) → AFF → MLARS restoration approval (December 23, 2024) → USMS transfer to Clerk of Court (January 21, 2025). Funds with a traceable, documented chain of custody are not the kind of absorbed, commingled general revenues that *Knote* held are beyond the pardon power.

Furthermore, the January 21, 2025 transfer of the funds from the AFF to the Clerk of Court removes them from any Treasury account entirely. Funds held in a court registry pending distribution are court-controlled property awaiting disposition under judicial oversight—not Treasury funds within the scope of the Appropriations Clause. At the moment of the Commutation Order on March 28, 2025, the funds were not in the Treasury in any sense; they were in the Clerk's registry, having been

4

transferred there because the Government chose to activate the restoration process under 18 U.S.C. § 981(e)(6). That was a discretionary executive act the Government could equally have declined to take. Having taken it, the Government cannot now claim the Appropriations Clause immunizes the result from a Presidential directive issued weeks later. These funds are not subject to Congressional powers they are clearly as the Government admits in control of the Executive Branch.

Finally, if the Government's theory were correct—that entry into the AFF in 2020 immediately and irrevocably vested these funds beyond any clemency power—then every Presidential commutation affecting a defendant who has forfeited property would be automatically stripped of financial significance. That is an extraordinary rule with no support in *Knote* or its progeny and would render meaningless the financial terms that the President deliberately included in this Commutation Order. A reading of *Knote* that nullifies express Presidential financial directives regardless of where the funds sit is incorrect and unsupportable.

## III. THE ATTORNEY GENERAL CANNOT EXERCISE DISCRETION TO DEFEAT THE PRESIDENTIAL DIRECTIVE SHE WAS COMMANDED TO CARRY OUT—AND THE MLARS TWO-STEP APPROVAL REQUIREMENT MAKES THIS CONCRETE.

### A. The Government's *Romeo* Defense Cannot Overcome the Commutation Order's Designation of the AG as the President's Personal Agent.

The Government's brief argues throughout that the Attorney General's discretionary authority under *Romeo* and 18 U.S.C. § 981(e)(6) to use forfeited funds for victim restoration is legally sufficient to sustain the lower court's denial. The Government does not address a structural argument that flows directly from the text of the Commutation Order itself—and the specific mechanics of the restoration process reveal exactly why that structural argument is dispositive.

The Commutation Order states in full relevant part:

> I HEREBY DESIGNATE, direct, and empower the Attorney General, as my representative, to sign the grant of clemency to the person named herein. The Attorney General shall declare that her action is the act of the President, being performed at my direction.

Executive Grant of Clemency, Jason Galanis (March 28, 2025). The President did not merely exercise clemency and leave implementation to ordinary bureaucratic channels. He specifically designated the Attorney General as his personal representative and commanded that her execution of the commutation "shall declare" itself to be "the act of the President, being performed at my direction."

This is not abstract constitutional theory. The DOJ's own Asset Forfeiture Policy Manual makes the structural conflict concrete. Restoration under 18 U.S.C. § 981(e)(6) is not a one-step ministerial act that was completed when the prior-administration MLARS chief issued an approval in December 2024. It is a *two-step process*. Step one is MLARS approval of the initial restoration request—obtained in

6

December 2024. Step two, which has never occurred, requires that the specific motion or stipulation to be filed with the court to effectuate disbursement must also be submitted to MLARS and approved before being filed. *See* DOJ Asset Forfeiture Policy Manual (2016 ed.), Ch. 14 at 166 ("[A]ll motions or stipulations must be sent to MLARS for approval before being filed with the court."). The Government's own District Court letter acknowledged that distribution would require further judicial action, and no motion under Rule 32.2(e) has ever been filed.

This procedural reality is dispositive. Before a single dollar moves from the Clerk's registry to any victim, the current AG must affirmatively authorize the court filing— a second, independent MLARS approval that has not been sought or obtained. The current AG is the same official the President designated as his personal agent to execute a commutation eliminating "all further . . . restitution." She cannot authorize a court filing delivering the economic equivalent of that eliminated restitution without directly contradicting the Presidential directive she was commissioned to carry out. *Romeo*'s confirmation that this decision is discretionary makes the conflict sharper, not more comfortable for the Government: the AG has no congressional compulsion requiring her to proceed. She would be choosing to exercise her discretion in a manner that defeats the President's express command.

## B. The Government's Reliance on the Prior-Administration MLARS Approval Cannot Survive the Commutation Order or the Change in Administration.

The Government relies on the December 2024 MLARS approval as an independent basis to proceed. The unitary executive framework forecloses that argument. Under *Trump v. United States*, 602 U.S. ___, slip op. at 13-15 (2024), all federal law enforcement authority is ultimately exercised under the President's control. Under *Myers v. United States*, 272 U.S. 52, 135 (1926), and *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2197 (2020), executive branch officials act through the President's constitutional authority, not in defiance of it. When the President cancels further restitution and designates the AG as his personal agent in doing so, no subordinate within the Department of Justice—not MLARS, not the United States Marshals Service, not the United States Attorney for the Southern District of New York—may invoke a prior-administration discretionary approval to circumvent that directive. The internal regulation that empowers MLARS to act, 28 C.F.R. § 9.8, authorizes MLARS to approve restoration "in connection with the return of forfeited property to victims pursuant to court-ordered restitution." The restitution order that provided MLARS its legal predicate has been commuted. MLARS's authority is derivative of that order. It does not survive the order's elimination.

The Government's brief also emphasizes that the prior MLARS restoration approval occurred on December 23, 2024—weeks before the new administration took office. A change in administration is itself a basis for reappraisal of discretionary executive

programs. *Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 59 (1983) (Rehnquist, J., concurring) ("[a] change in administration brought about by the people casting their votes is a perfectly reasonable basis for an executive agency's reappraisal of . . . its programs"). A prior-administration MLARS chief's discretionary approval, issued in the final weeks of a departing government, does not bind the current AG—particularly not when the President she serves has expressly commuted the financial obligations that the restoration process was designed to fulfill, and has done so by designating her as his personal agent to execute that very instrument.

*Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 425 (1990), confirms that the Appropriations Clause prevents the President from unilaterally directing expenditures from the Treasury. That principle runs in one direction: it protects congressional prerogatives from Presidential overreach. It does not independently authorize a subordinate executive officer to exercise her statutory discretion—which *Romeo* confirms is not congressionally compelled—in a manner that nullifies the financial terms of a Presidential commutation she was designated to execute. The Government points to no authority for that proposition, because no such authority exists.

### C. The Resulting Constitutional Disability Is Permanent and Precludes Completion at Every Level of the Chain of Command.

9

The consequence of this constitutional disability is not merely procedural inconvenience—it is permanent and irreversible deadlock. The restoration process is not incomplete in the way that an administrative process might be incomplete pending further agency action. It is constitutionally incapable of completion through any lawful mechanism currently available. The only official with authority to take the next required step—authorizing the second MLARS approval and the court motion that must follow—is the same official the President designated as his personal agent to execute an instrument eliminating the very obligation that step would fulfill. The Attorney General's delegation of restoration authority to the MLARS chief under 28 C.F.R. § 9.1(b)(2) does not cure that disability: delegated authority cannot exceed the authority of the delegating officer, and a delegation cannot confer power to act in contradiction of a Presidential directive that binds the delegating officer herself. A MLARS chief who proceeded independently would be acting in direct defiance of the AG's supervisory authority—itself an exercise of Presidential power under the unitary executive framework. The same disability cascades to Southern District of New York (SDNY): the United States Attorney's Office cannot file a Rule 32.2(e) motion without prior MLARS authorization it has no power to grant itself and that no superior in the current chain of command can lawfully provide. SDNY is affirmatively precluded from seeking the authorization it would need to proceed. No change in facts cures the underlying conflict. No further

10

motion practice resolves it. The District Court cannot proceed because there is no lawful actor who can move the process forward. The funds are not in temporary legal limbo awaiting a statutory next step. They are in constitutional suspension—held for a purpose that cannot legally be executed, by a court that has no jurisdiction to order its completion, under a process whose only authorized actor is constitutionally disabled from acting. That is precisely the condition Rule 41(g) was designed to remedy: criminal proceedings concluded, stated purpose for retention eliminated, no lawful basis for continued custody existing or capable of being created. The remedy is return.

The District Court's incapacity is not structural inference—it is established black-letter law. Rule 32.2(e)(1) limits court action on forfeiture disbursement to 'the government's motion.' The court has no independent restoration authority; that power is vested exclusively in the Executive Branch and the MLARS process. *United States v. Cohan*, 988 F.Supp.2d 323, 329 (E.D.N.Y. 2013); see also ECF 571 at 3 (SDNY acknowledging to Judge Castel in 2021 that "courts do not have authority to order restoration absent a motion from the Government and approval by MLARS"). That prior acknowledgment is significant: the Government's own position in this case confirms that judicial authority to order restoration is absent without a MLARS-approved government motion—which cannot be filed for all the

11

reasons stated above. The District Court on remand would be as powerless as it is today. Affirming this judgment does not send the case to a court that can resolve it.

SDNY is therefore asking this Court to affirm a judgment that preserves a process every level of the Executive Branch is legally powerless to advance. That is the architecture of the Executive Branch working as designed, not a gap to be papered over by judicial decree. Reversing the District Court's order restores the constitutional order. Affirming it requires this Court to freeze in place a process that no lawful actor can complete.

The District Court resolved this case entirely on textual grounds without reaching the structural question of whether the restoration process can be lawfully completed. That question—which the Government's appellate brief leaves entirely unanswered, despite the AG-as-agent language having been on the face of the Commutation Order since March 28, 2025—is now squarely before this Court. That the Government has not addressed it speaks for itself.

## IV. THE GOVERNMENT'S INTERNAL CONTRADICTION ON FORFEITURE AND RESTITUTION INDEPENDENTLY DEFEATS ITS POSITION.

The Government's brief contains an internal contradiction that independently warrants reversal. On one hand, the Government correctly states—and Galanis has consistently acknowledged—that "[r]estitution and forfeiture are authorized by

12

different statutes and serve different purposes." (Br. for United States 22) (quoting *United States v. Torres*, 703 F.3d 194, 196 (2d Cir. 2012)).) The Government further argues, relying on *Romeo*, that the AG had no obligation to use the Forfeiture Proceeds for victim restoration, that the restoration decision is purely discretionary, and that the enforceability of the Forfeiture Order is not tethered to the existence of the Restitution Order. (Id. at 20-22.)

But the Government simultaneously argues that the Commutation Order—which expressly commuted the restitution obligation—has no effect on the restoration process because restoration draws on forfeited funds, not Galanis's personal assets. (Id. at 14-16.) These positions cannot both be true.

If restitution and forfeiture are truly independent, then the commutation of the restitution obligation does not affect the Government's authority to use forfeited funds. *But* if the restoration process is truly independent of the restitution framework, the Government must explain why it expressly used the Restitution Order as the legal predicate and source of victim identification to justify the very transfer it now defends. The Government's own brief states that the January 2025 transfer to the Clerk of Court was made "for the purpose of **applying the funds to restoration to the victims identified in the Restitution Order.**" (Br. for United States 10) (emphasis added). The restoration process was not independent of the restitution framework—it was anchored to it from the moment the funds moved. The

13

Restitution Order identified the victim class and provided the legal foundation for the entire pipeline.

Before the District Court, SDNY conceded that it does not itself possess the updated victim allocation information necessary to complete distribution and that current records would need to be obtained by direct court request from the Clerk. (ECF 613 at 8.) The specific payee identification and amount allocation that would constitute the substance of the pending second MLARS approval has never been sought or filed.

This contradiction runs deeper than framing. The Government twice sought MLARS approval to use forfeiture proceeds for restoration—once in 2021 and again in December 2024. At no point did it argue the funds were simply government property untethered to restitution. It consistently treated them as conditionally held for restitution payment, and the District Court's own docket entry of January 21, 2025 describes the funds as transferred "to be applied to Restitution." Having chosen to administer the Forfeiture Proceeds through a restitution-tethered restoration process built on the Restitution Order—and having secured a procedural posture built on that framework—the Government cannot disavow it now that the commutation has made it fatal to its position. Judicial estoppel bars precisely this maneuver. *See New Hampshire v. Maine*, 532 U.S. 742, 749–51 (2001); *Bates v. Long Island R.R. Co.*, 997 F.2d 1028, 1038 (2d Cir. 1993).

Nor does the Government's reliance on *Sharma* alter this analysis: even where restoration proceeds independently of a restitution order, the AG must still complete the MLARS approval process and file a court motion—the very steps that the structural conflict identified in Section III renders constitutionally incapable of completion. The contradiction in the Government's own brief is revealing. The Government represents to this Court that the January 2025 transfer was made "for the purpose of applying the funds to restoration to the victims identified in the Restitution Order." (Br. for United States 10.) Yet it simultaneously invokes *Sharma* to argue that restoration can proceed without any restitution order at all. (Id. at 22.) This is not mere inconsistency—it is an attempt to enlist this Court as the instrument for completing a process the President expressly directed should cease; while offering whatever legal theory the moment requires to keep that process alive.

Unable to sever forfeiture from restitution through its conduct, the Government's remaining avenue is a vesting theory. Its vesting argument, carried to its logical conclusion, implies that the economic interests of victims were satisfied when the Final Order of Forfeiture became final in 2020—that what followed was merely ministerial disbursement of funds already constructively paid. That is the necessary implication of the Government's own finality argument—and it fails on four independent grounds.

15

First, it is refuted by the Government's own conduct: if restitution had occurred in 2020, there would have been no need to submit a MLARS restoration request in 2021, fail to complete it, and submit a second request in December 2024. Parties do not seek permission to complete what is already done.

Second, it is foreclosed by the District Court's own August 2021 ruling—by the same Judge Castel whose order is on appeal—which found that no MLARS approval had issued, that no restoration had occurred, and that restoration is "a discretionary process" that victims cannot compel. Judge Castel held that victims "cite no authority" for the proposition that they may "compel the government to apply funds lawfully forfeited to the government to pay a defendant's unsatisfied restitution obligation," and noted that victims "claim no rights arising under the Court's Final Order of Forfeiture." (Dkt. 575 at 1–2 & n.1.) The Government never appealed that ruling. It instead chose—voluntarily, under the very discretion Castel identified—to build the restoration pipeline on the Restitution Order. The Government itself confirms this voluntariness in its brief to this Court, acknowledging that the transfer "represented a discretionary decision by the United States Government regarding its own property." (Br. for United States 21.) Having exercised that discretion in a specific direction, the Government cannot now argue restitution was complete a year earlier without contradicting a final judicial determination it allowed to stand.

Third, it is inconsistent with the Government's own legal position in this appeal: the Government correctly states, relying on *Torres*, that forfeiture and restitution are authorized by different statutes and serve different purposes. A forfeiture judgment that vests title in the United States does not constitute restitution to victims—if it did, the entire MLARS restoration framework, including the two-step approval process the Government invokes to defend its continued custody, would be entirely superfluous.

Fourth, the Commutation Order itself forecloses it. The President commuted "no further fines, restitution, probation, or other conditions." If restitution had already occurred, that word was surplusage—there would have been nothing left to commute. Under *Andrews*, the President does not use surplusage. The argument that restitution was accomplished before the Commutation Order issued cannot be reconciled with the Commutation Order's own text.

## V. THE GOVERNMENT'S FALLBACK IN FOOTNOTE 5 CONFIRMS THAT EQUITABLE RELIEF IS REQUIRED.

The Government argues in footnote 5 that even if the Commutation Order somehow prevented the restoration process from proceeding, the funds would revert to the Treasury rather than go to Galanis, because Galanis has no property interest in them. (Br. for United States 23 n.5.) This argument is advanced as a logical backstop. Its

17

actual effect is to reveal the absence of any legitimate equitable justification for the Government's position.

The Government's primary defense of denying Galanis's Rule 41(g) motion is that the funds will compensate victims of serious financial crimes—a purpose the Government frames as equitably compelling. It does not argue entitlement to retain the funds as punishment, deterrence, or general revenue. It defends retention on the singular ground that the money will go to victims. But the same judge whose order is on appeal has already held that victims have no enforceable right to restoration and no rights under the Forfeiture Order. (Dkt. 575 at 1–2 & n.1.) The equitable foundation the Government invokes was always contingent—and the commutation extinguished the contingency. The equitable calculus is informed by the nature of the assets at issue—proceeds from real property acquired years before any charged conduct, not direct proceeds of fraud or any criminal conduct.

Footnote 5 abandons that defense. If the Government loses on the restoration question, victims receive nothing—and the Government keeps the money in the Treasury. The Government is not defending victim compensation. It is defending government retention, with victim compensation as the preferred vehicle and Treasury reversion as the fallback. No equitable principle supports government retention of funds under those circumstances, and Rule 41(g) exists precisely to prevent that result.

18

Rule 41(g) is an equitable remedy. Courts exercising equitable jurisdiction balance the competing interests at stake. Where the Government's only articulated justification for retaining seized property—victim compensation—has been legally extinguished by Presidential commutation, and where the Government's own fallback position confirms that the alternative is unjust enrichment of the sovereign, equity strongly favors return, especially in this situation where the funds in question were generated by the sale of property bought long before any criminal activity alleged in both indictments. Thus, the source of the funds used to purchase the property were not ill-gotten gains. The District Court's denial of equitable relief on these facts constitutes an abuse of discretion. Denial was premised on purposes the Government itself acknowledges may not be achievable.

## VI. THE DEVON ARCHER COMPARISON CONFIRMS RATHER THAN DEFEATS GALANIS'S POSITION.

The Government asks this Court to affirm a judgment resting primarily on the District Court's comparison between Galanis's Commutation Order and the full pardon granted to co-defendant Devon Archer in the related case, *United States v. Archer*, 16-cr-371 (RA). (Op. at 5-6.) The Government's textual argument—that "further" means only prospective personal obligations—is the same conclusion the District Court reached based on that comparison, and the Government's brief defends the judgment below without offering any independent answer to the Archer analysis

19

that undergirds it. (Br. for United States 14-16.) That comparison is wrong for three independent reasons, each of which the Government's brief leaves unanswered.

Judge Castel observed that Archer's pardon directed "the remission of any and all fines, penalties, forfeitures, and restitution ordered by the court," and that the Government consented to lifting all judgment liens and returning all collected but undisbursed forfeiture and restitution funds. He concluded that the President knew how to order the return of funds and chose not to for Galanis, and that Galanis's commutation therefore provided only prospective relief. (Op. at 6.) The comparison is instructive—but it cuts in Galanis's favor, not the Government's.

First, "remission" and "commutation" are different constitutional instruments with different legal functions. "Remission" is a term of art in pardon and clemency law denoting the forgiveness or giving-back of a financial penalty already collected or imposed. It operates retrospectively to undo what has been done. "Commutation" modifies the ongoing terms of a sentence—it changes only how the sentence is carried out by switching out a greater punishment for a lesser one. *Dennis v. Terris*, 927 F.3d at 958. That the Archer pardon used "remission" language to accomplish a specific backward-looking financial remedy does not mean the absence of "remission" in Galanis's commutation signals an intent to deny all financial relief. Archer received a full and unconditional pardon—a different constitutional act— that specifically included retrospective financial relief. Galanis received a sentence

20

commutation that expressly addressed ongoing financial obligations by eliminating them. The textual comparison between different instruments proves nothing about the scope of the commutation's financial terms.

Second, the two defendants were in materially different procedural postures that explain the different language. Archer's conviction was not yet final at the time of his pardon—his case was on direct appeal. In that posture, a pardon with "remission" language was legally necessary to accomplish backward-looking financial relief because the conviction had not yet become a final judgment. Galanis's conviction was already a final judgment. A commutation—which operates on the sentence, not the conviction—was the appropriate instrument. The different language reflects the different legal mechanics required in each case, not a deliberate Presidential choice to deny Galanis financial relief while granting it to Archer.

Third, and most fundamentally, the District Court's inference proves too much. If the inclusion of "no further fines, restitution, probation, or other conditions" in the Commutation Order meant only that Galanis personally need not write more checks going forward—with no other operative financial effect—then those words added nothing to a commutation that was already releasing Galanis from incarceration. A commutation to "time served" is facially sufficient to release a defendant from prison. The additional language concerning fines, restitution, probation, and conditions must be given independent operative meaning or it is surplusage. The

21

President is presumed not to use surplusage. *See Andrews v. Warden*, 958 F.3d at 1081 ("The President, like Congress, is presumed to know the law and to speak in terminology that subordinate officials would understand."). A reading of "no further restitution" that permits the Government to complete, through a discretionary statutory and regulatory pipeline, the economic equivalent of the restitution obligation the President just eliminated, gives the financial terms of the Commutation Order zero operative content. That cannot be the correct reading.

The presumption of deliberate Presidential word choice is at its most powerful here because the specific factual predicate for those words was a matter of public docket record on the day the Commutation Order was signed. By March 28, 2025, the Southern District docket reflected a highly visible entry: an unnumbered docket entry of January 21, 2025, reflecting that the USMS had transferred $2,170,196.34 to the Clerk of Court, stating expressly that the funds were "received by the Clerk's Office on 1/21/2025 to be applied to Restitution." Case 1:15-cr-00643-PKC, Dkt. Entry Jan. 21, 2025. The specific sum, the specific account, and the specific restitution designation were all visible on the face of the docket. When the President wrote "no further . . . restitution," he wrote those words with that context before him. The *Andrews* presumption that the President speaks with knowledge of the legal and factual context does not merely support giving those words operative meaning—it compels it. The District Court's inference that the President simply omitted

22

"remission" language if he meant to reach those funds inverts the presumption entirely. The more natural reading is that the President, aware of exactly what was sitting in the Clerk's registry and why, used the financial terms he used because he intended them to have financial effect.

The Archer comparison, properly understood, confirms what the docket record already establishes: the President knew how to address financial consequences in clemency instruments—and he chose to do so here by expressly commuting the restitution obligation.

## VII. THE GOVERNMENT'S VESTING THEORY FAILS UNDER ITS OWN AUTHORITY AND BOULTBEE IS DISTINGUISHABLE AND DOES NOT CONTROL.

The Government invokes *Schick v. Reed*, 419 U.S. 256 (1974), for the principle that courts should not "alter" a presidential commutation. (Br. for United States 12, 14.) But it then asks this Court to do precisely what *Schick* forbids. The Supreme Court held that the pardoning power "derives from the Constitution alone" and "cannot be modified, abridged, or diminished by any statute." *Id.* at 266. The Government's vesting theory deploys the Appropriations Clause and *Knote* to nullify the financial terms the President chose to include in the Commutation Order—the very statutory diminishment *Schick* prohibits. That the Government chose to cite *Schick* for one narrow proposition while omitting the holding that forecloses its central argument is not mere selectivity—it is a misrepresentation of its own authority to this Court. *See*

23

*also Biddle v. Perovich*, 274 U.S. 480, 486 (1927) ("A pardon in our days is not a private act of grace from an individual happening to possess power. It is a part of the constitutional scheme.").

The Government relies on the Federal Circuit's April 10, 2025 affirmance of *Boultbee v. United States*, No. 2024-2260, 2025 WL 1077679 (Fed. Cir. Apr. 10, 2025), as updated authority supporting the proposition that *Knote*'s vesting principle remains good law. (Br. for United States 20.) That it does is not disputed. What *Boultbee* does not address is dispositive here.

*Boultbee* involved a standard pardon that said nothing specific about forfeiture, restitution, fines, or other financial obligations. The court applied *Knote* to hold that the pardon could not reach property that had vested in the United States. That analysis is unremarkable. A pardon silent on financial consequences does not create financial consequences. *Knote*'s rule operates as a background presumption where the Presidential instrument says nothing about money.

Here, the instrument is not silent. The Commutation Order contains express language commuting "no further fines, restitution, probation, or other conditions." The question is not whether a generic pardon reaches vested forfeiture proceeds— *Knote* says it does not. The question is whether a commutation order that expressly addresses and eliminates the restitution obligation, issued by a President who

24

specifically designated the AG as his agent to carry out that commutation, has any operative effect on a discretionary statutory process designed specifically to fulfill the eliminated obligation. *Boultbee* does not answer that question. Nor does any other case cited in the Government's brief.

The Government has not identified a single case holding that express financial terms in a commutation order have no operative effect on a discretionary executive restoration process designed to fulfill the commuted obligation. That absence—in a brief filed by the SDNY—is telling. The Government's argument is not that controlling authority resolves this question against Galanis. It is that *Knote* should be extended by analogy to a situation factually distinct from anything *Knote* addressed. This Court is not required to make that extension, and the structural arguments set forth above counsel strongly against it.

The Government's brief acknowledges in footnote 2 that a live circuit split exists in the District of Columbia over whether pardoned defendants can recover funds when convictions are subsequently vacated, citing *United States v. Ballenger*, No. 1:21-cr-00719 (D.D.C.), *appeal docketed*, No. 23-3198 (D.C. Cir.), and *United States v. Sullivan*, No. 1:21-cr-00078 (D.D.C.), with that question currently pending in the D.C. Circuit. The existence of active, unresolved judicial disagreement on closely related questions at the intersection of clemency and forfeiture law is further evidence that the Government's argument that *Knote* forecloses all relief is an

overstatement. This Court should resolve the open questions on this record in a manner consistent with giving genuine effect to a Presidential commutation that expressly addressed financial obligations, was executed by the AG as the President's personal agent and eliminated a restitution obligation that has not yet been carried out through any consummated act of disbursement.

## CONCLUSION

The President of the United States directed that Jason Galanis's sentence be commuted to time served with "no further fines, restitution, probation, *or other conditions*"—and personally designated the Attorney General to carry out that directive. The "other conditions" catch-all forecloses any attempt to recharacterize the obligation and continue it under a different name. The Attorney General has not appeared in this appeal. She has not endorsed the restoration process or taken any position that the commutation permits it to continue. Instead, the SDNY—a subordinate office acting on its own—asks this Court to complete the very restitution process the President eliminated and the Attorney General has declined to defend. The President's words have force. The Framers gave the President this authority knowing it would sometimes produce results that feel unjust—for the guilty, for the public. That is the design. The pardon power "cannot be modified, abridged, or diminished by any statute," *Schick v. Reed*, 419 U.S. at 266—and it is not subordinate to prosecutorial preferences about how forfeited funds should be spent.

26

The timeline is not incidental. The public docket reflected, as of March 28, 2025, that $2,170,196.34 had been transferred to the Clerk of Court sixty-six days earlier and designated expressly for restitution. The President signed a commutation eliminating restitution on that record. The financial terms he chose were not boilerplate—they were a direct response to a specific, publicly documented financial situation. Giving those terms no operative effect, as the Government urges, is not faithful construction. It is erasure.

Affirming the District Court's order does not send this case to a productive resolution. It permanently condemns $2,170,196.34 to sit in the Clerk's registry with no lawful path to any destination. The AG cannot complete the restoration process without acting against the Presidential directive she was commissioned to execute. Her delegee MLARS chief cannot cure that disability—delegated authority cannot exceed the authority of the delegating officer. And SDNY, the office defending this judgment, cannot file the required Rule 32.2(e) motion without MLARS authorization that no one in the current chain of command can lawfully provide. The District Court cannot order completion of a process whose legal predicate has been eliminated. And the Government's own fallback—Treasury reversion—confirms that victims receive nothing either way. Courts of equity do not produce that result when a clean equitable remedy is available. This Court, sitting in equity on a Rule 41(g) appeal, has both the authority and the occasion to say so.

27

The funds were seized for restitution. Restitution was commuted by the President. The restitution was never paid and, by operation of the constitutional deadlock established above, can never be paid. Under Rule 41(g), when the Government's legal claim to property lapses, the remedy is return. For these reasons, and those stated in Galanis's opening brief, this Court should reverse the judgment of the District Court and order the return of the Forfeiture Proceeds to Galanis.

Dated: April 1, 2026
 New York, New York

<div style="margin-left:40%">

Respectfully submitted,

_/s/ David Touger_
David Touger, Esq.
Peluso & Touger, LLP
Counsel for Defendant-Appellant Jason Galanis
408 Broadway
New York, New York 10013
(212) 608-1234

</div>

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed.R.App.P.32(a)(7)(B) because this brief contains 6314 words, excluding the parts of the brief exempted by Fed.R.App.P.32(a)(7)(B)(iii).  This brief complies with the typeface requirements of Fed.R.App.P.32(a)(5) and the type style requirements of Fed.R.App.P.32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14 pt font size of Times New Roman.


Dated:     New York, New York
           April 1, 2026


                              */s/ David Touger*
                              _____
                              David Touger
                              Attorney for Appellant Deshawn Thomas
                              408 Broadway
                              New York, New York 10013
                              (212) 608-1234